UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


KIM HEAVENER,

                Plaintiff,                                      Hon. Janet T. Neff

v.                                                       Case No. 1:09-CV-493

COMMISSIONER OF SOCIAL
SECURITY,

                Defendant.
_____/


## REPORT AND RECOMMENDATION

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive. Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

interference.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted).  This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.


## PROCEDURAL POSTURE

Plaintiff was 49 years of age when her insured status expired.  (Tr. 63, 661).  She completed the ninth grade and worked previously as a dishwasher, janitor, and Certified Nursing Assistant.  (Tr. 82, 87, 103-09).

Plaintiff applied for benefits on September 11, 2003, alleging that she had been disabled since September 17, 2001, due to chronic neck pain, back pain, inability to lift or bend, weakness, knee injury, neck injury, and bronchitis.  (Tr. 66-68, 81).  Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 29-62).  On September 9, 2005, Plaintiff appeared before ALJ James Prothro, with testimony being offered by Plaintiff and vocational expert, Randy Nelson.  (Tr. 614-49).  In a written decision dated January 10, 2006, the ALJ determined that Plaintiff was not disabled as defined by the Social Security Act.  (Tr. 16-28).  The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter.  (Tr. 5-7).  Plaintiff subsequently sought judicial review of the ALJ's decision.

On November 9, 2007, the Honorable Hugh W. Brenneman, Jr., recommended that the Commissioner's decision be reversed because the ALJ failed to articulate "good reasons" for affording less than controlling weight to opinions expressed by Dr. Edward Hatt.  (Tr. 674-86).  The

Honorable Gordon J. Quist adopted this recommendation and the matter was remanded to the Commissioner for further factual findings. (Tr. 673). On December 2, 2008, a second hearing was held before ALJ Prothro, with testimony being offered by Plaintiff, Plaintiff's husband, and vocational expert, Michelle Ross. (Tr. 919-56). In a written decision dated January 8, 2009, the ALJ determined that Plaintiff was not disabled as defined by the Social Security Act. (Tr. 661-68). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 650-53). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

Plaintiff's insured status expired on December 31, 2005. (Tr. 661). To be eligible for Disability Insurance Benefits under Title II of the Social Security Act, Plaintiff must establish that she became disabled prior to the expiration of her insured status. *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).


## RELEVANT MEDICAL HISTORY

In approximately May 1998, Plaintiff underwent cervical fusion surgery. (Tr. 288). Treatment notes dated October 16, 2000, indicate that Plaintiff was instructed to treat her allegations of neck pain by: (1) quitting smoking, (2) losing weight, and (3) exercising regularly. (Tr. 432). On November 28, 2000, Plaintiff participated in a CT scan of her head, the results of which were "negative." (Tr. 288).

On May 10, 2001, Plaintiff participated in a nerve conduction examination of her left upper extremity, the results of which were "entirely normal," with "no evidence of denervation or inflammatory myopathy." (Tr. 275). Dr. Steven Van Doornik concluded that Plaintiff's pain

symptoms were "related to cervical degenerative disease and myofascial pain,"[1] for which physical therapy was recommended. (Tr. 275).

X-rays of Plaintiff's chest, taken on July 29, 2001, were "negative." (Tr. 235). The lungs and pleural spaces were "clear," there was no evidence of pneumothorax, and the cardiac silhouette and pulmonary vascularature were "within normal limits." (Tr. 235).

On August 16, 2001, Plaintiff reported that she was taking "up to six" Vicodin tablets daily to treat her neck pain. (Tr. 414). On August 18, 2001, Plaintiff participated in an MRI examination of her cervical spine, the results of which revealed a "minimal" disc bulge at C5-6. (Tr. 449-50). Treatment notes dated August 24, 2001, indicate that Plaintiff's neck pain was myofascial and degenerative in nature. (Tr. 413).

On September 20, 2001, Plaintiff reported to the emergency room complaining of flu-like symptoms with cough and congestion. (Tr. 238). An examination of Plaintiff's chest revealed "decreased aeration," but was "otherwise clear." (Tr. 238). X-rays of Plaintiff's chest "showed increased bronchial markings," but was otherwise "negative." (Tr. 238). Plaintiff was diagnosed with acute bronchitis. (Tr. 238).

On September 24, 2001, Plaintiff was examined by Dr. Steven Kraker. (Tr. 192-93). The doctor reported that Plaintiff "is found sitting comfortably in a chair breathing room air with an oxygen saturation of 93%." (Tr. 192). Dr. Kraker concluded that Plaintiff "is clearly responding to current therapy" and should experience "gradual resolution of her current [respiratory] symptoms." (Tr. 193).

---

[1] Myofascial pain refers to pain and inflammation in the body's soft tissues. *See, e.g.,* Pain Management, available at http://www.medicinenet.com/muscle_pain/article.htm (last visited on July 12, 2010).

On September 27, 2001, Plaintiff participated in an MRI examination of her lumbar spine, the results of which were "negative" with "no evidence of disc herniation." (Tr. 446).

On October 15, 2001, Plaintiff reported to the emergency room complaining of headaches. (Tr. 254). Plaintiff was in no apparent distress and the results of an examination were unremarkable. (Tr. 257). Plaintiff was given pain medication. (Tr. 255, 257).

On October 18, 2001, Plaintiff was examined by Dr. Sanjeev Mathur. (Tr. 404). Plaintiff reported that she was experiencing low back pain. (Tr. 404). An examination of Plaintiff's back was unremarkable with no evidence of tenderness. (Tr. 404). Plaintiff was instructed to "exercise[,] try and decrease her weight and to do low back strengthening exercises." (Tr. 404).

On October 23, 2001, Plaintiff reported to the emergency room complaining of headaches. (Tr. 260). Plaintiff was in no apparent distress and the results of an examination were unremarkable. (Tr. 263). Plaintiff was given pain medication. (Tr. 261, 263).

On November 16, 2001, Plaintiff reported to the emergency room complaining of "cough and cold symptoms." (Tr. 244). Plaintiff was in no acute distress and her respirations were "unlabored." (Tr. 244). An x-ray of Plaintiff's chest was "negative." (Tr. 244). Plaintiff was prescribed Vicodin. (Tr. 244).

X-rays of Plaintiff's left shoulder and cervical spine, taken on November 29, 2001, revealed the following: (1) "essentially negative left shoulder," and (2) previous fusion of C6-7, but the cervical spine was "otherwise negative" with "normal disk spaces and no evidence of encroachment upon the neural foramina." (Tr. 266). On January 10, 2002, Plaintiff participated in an MRI of her cervical spine, the results of which revealed "mild" disc bulging at C5-6 "without cord compression." (Tr. 442-43).

Treatment notes dated January 22, 2002, indicate that Plaintiff's pharmacy refused to fill her Vicodin prescription because she too quickly consumed her previous Vicodin prescription. (Tr. 398). Dr. Mathur instructed the pharmacy to provide Plaintiff with additional Vicodin. (Tr. 398).

On February 7, 2002, Plaintiff participated in a nerve conduction examination of her right upper extremity, the results of which were "normal." (Tr. 270). Dr. Van Doornik noted that Plaintiff had not yet participated in physical therapy which he again recommended. (Tr. 270).

On February 17, 2002, Plaintiff telephoned Dr. Mathur to report that she "fell and is in pain." (Tr. 397). Plaintiff stated that she "usually takes Vicodin but is running out of them." (Tr. 397). The doctor approved a refill of Plaintiff's Vicodin prescription. (Tr. 397).

On February 26, 2002, Plaintiff telephoned Dr. Mathur. (Tr. 395). Plaintiff reported that "she is out" of Vicodin because she was taking it as needed instead of only four times daily as prescribed. (Tr. 395). The doctor agreed to Plaintiff's request for additional Vicodin. (Tr. 395).

On March 11, 2002, Plaintiff telephoned Dr. Mathur requesting a "refill on Vicodin." (Tr. 394). The doctor agreed to Plaintiff's request. (Tr. 394).

On March 29, 2002, Plaintiff reported to the emergency room complaining of headaches. (Tr. 303). The results of an examination were unremarkable. (Tr. 306). Plaintiff was given pain medication. (Tr. 304).

On May 15, 2002, Plaintiff was examined by Dr. Mathur. (Tr. 386). Plaintiff reported that she was experiencing recurrent headaches that were "not associated with any paresthesias, weakness, or trouble with vision." (Tr. 386). The results of an examination were unremarkable with no evidence of neurological, motor, or sensory deficits. (Tr. 386). Plaintiff was

instructed to "wean down the Vicodin." (Tr. 386). The doctor also informed Plaintiff that she "will not be given any further refills of Vicodin." (Tr. 386).

On May 26, 2002, Plaintiff reported to the emergency room complaining of headaches. (Tr. 310). The results of an examination were unremarkable. (Tr. 313). Plaintiff was given pain medication. (Tr. 311).

On June 3, 2002, Plaintiff reported to the emergency room complaining of foot pain. (Tr. 317). Plaintiff reported that she "stubbed" the middle toe on her left foot. (Tr. 321). X-rays of Plaintiff's left foot were negative with no evidence of bone or joint abnormality. (Tr. 323).

On June 22, 2002, Plaintiff reported to the emergency room complaining of a toothache. (Tr. 245). The results of an examination were unremarkable. (Tr. 245). Plaintiff was given pain medication, as well as an additional prescription for Vicodin. (Tr. 246).

On July 6, 2002, Plaintiff reported to the emergency room complaining that "something" was in her left eye. (Tr. 325, 327). Plaintiff was in no apparent distress and the results of an examination revealed "no foreign body or evidence of injury." (Tr. 328).

On July 20, 2002, Plaintiff reported to the emergency room complaining of mouth pain. (Tr. 332). An examination revealed no evidence of infection. (Tr. 334-35). Plaintiff was given pain medication and instructed to consult with her oral surgeon. (Tr. 333-35).

On October 24, 2002, Plaintiff reported to the emergency room complaining of headaches. (Tr. 247). The results of an examination were unremarkable, except for the fact that Plaintiff began experiencing dry heaves. (Tr. 247). Plaintiff was given pain medication, as well as an additional prescription for Vicodin. (Tr. 247-48).

On October 28, 2002, Plaintiff telephoned Dr. Mathur to report that her Ultram prescription was "not working" and that she "needs something else." (Tr. 383). The doctor recommended that Plaintiff attend a pain clinic. (Tr. 383).

On November 7, 2002, Plaintiff was examined by Dr. Bennett Willard. (Tr. 376). Plaintiff reported that she was experiencing pain in her thoracic spine and left upper extremity. (Tr. 376). The doctor theorized that Plaintiff's symptoms may be caused by a disc protrusion at C5-6. (Tr. 376). Dr. Willard recommended to Plaintiff that she receive a cervical epidural steroid injection. (Tr. 376). Plaintiff declined, stating that she "is not interested in treatment." (Tr. 376).

On November 8, 2002, Plaintiff was examined by Dr. Mathur. (Tr. 380). Plaintiff reported that she was experiencing pain in her neck, back, and shoulders. (Tr. 380). The doctor observed "generalized tenderness" over Plaintiff's trapezius muscles, but also noted that "there is no swelling of the trapezius muscles as she claims." (Tr. 380). Dr. Mathur concluded that Plaintiff's complaints were "of musculoskeletal etiology." (Tr. 380). Plaintiff was advised to "minimize" the use of pain medication. (Tr. 380).

On November 20, 2002, Plaintiff telephoned Dr. Mathur requesting additional pain medication. (Tr. 379). Plaintiff was given a prescription for Darvocet. (Tr. 379). On November 26, 2002, Plaintiff telephoned Dr. Mathur complaining that her pain medication was affording her "no relief." (Tr. 379).

On November 30, 2002, Plaintiff reported to the emergency room complaining of right knee pain. (Tr. 249). Plaintiff was "somewhat vague" when attempting to describe how she injured herself. (Tr. 249). An examination was unremarkable with "no visible evidence of trauma to the entire right lower extremity." (Tr. 249). The doctor noted, however, that Plaintiff was

"superficially tender in many regions and inconstantly so." (Tr. 249). X-rays of Plaintiff's right hip, knee, and foot were all negative. (Tr. 438). Plaintiff was given pain medication, as well as an additional prescription for Vicodin. (Tr. 249-50). On December 2, 2002, Dr. Mathur gave Plaintiff another prescription for Vicodin. (Tr. 377).

On December 3, 2002, Plaintiff was examined by Dr. Roger Lemmen. (Tr. 482-88). Plaintiff reported that she was experiencing neck and back pain. (Tr. 482). The doctor observed tenderness in Plaintiff's neck, shoulders, and back, but there was no evidence of neurological, motor, or sensory impairment. (Tr. 486). Also, Spurling's maneuver,[2] straight leg raising, and Tinel's sign[3] were all negative. (Tr. 486). The doctor concluded that Plaintiff was experiencing musculoskeletal pain and modified her medication regimen. (Tr. 487).

That same day, Plaintiff participated in an MRI examination of her right knee, the results of which revealed "moderate" effusion, but no evidence of a meniscal tear. (Tr. 437). Two days later, Plaintiff participated in a bone scan, the results of which were "negative." (Tr. 436).

On December 26, 2002, Plaintiff reported to Dr. Lemmen that she was experiencing an "improvement" in her pain. (Tr. 480). Specifically, Plaintiff reported that her pain presently averaged 4 on a scale of 1-10. (Tr. 480).

On January 16, 2003, Plaintiff was examined by Dr. Edward Hatt. (Tr. 456). Plaintiff reported that she was experiencing pain in her right knee and lower back. (Tr. 456). An

---

[2] A positive Spurling's test suggests the presence of a cervical nerve root disorder. Thomas W. Woodward, M.D., and Thomas M. Best, M.D., Ph.D., *The Painful Shoulder: Part I Clinical Evaluation*, American Family Physician, May 15, 2000, *available at*, http://www.aafp.org/afp/20000515/3079.html (last visited July 12, 2010).

[3] Tinel's test (or Tinel's sign) refers to a tingling sensation at the end of a limb produced by tapping the nerve at a site of compression or injury. This test is also used to detect the presence of carpal tunnel syndrome. J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* T-140 (Matthew Bender) (1996); Frank L. Urbano, M.D., *Tinel's Sign and Phalen's Manuever: Physical Signs of Carpal Tunnel Syndrome*, Hospital Physician, July 2000 at 39.

examination of Plaintiff's knee revealed "bogginess" and "tenderness." (Tr. 456). An examination of her back revealed "lumbar and sacroiliac joint tenderness." (Tr. 456). Dr. Hatt prescribed 6-8 Vicodin tablets daily. (Tr. 456).

On January 18, 2003, Plaintiff's husband completed a questionnaire regarding Plaintiff's activities. (Tr. 90-95). He reported that on a "typical day," Plaintiff performs house chores, prepares meals, cares for her pets, makes greeting cards on the computer, visits with friends and talks on the telephone. (Tr. 90). He also reported that Plaintiff bakes, shops, and reads. (Tr. 90-92).

On January 29, 2003, James Stark, A.C.S.W., authored a letter regarding his treatment of Plaintiff. (Tr. 455). Stark reported that he counseled Plaintiff on six occasions between October 10, 2001, and January 10, 2002, during which time Plaintiff's "depressive symptoms decreased." (Tr. 455).

On February 7, 2003, Plaintiff reported that her "knee has improved." (Tr. 568). Dr. Hatt reported that Plaintiff should participate in physical therapy. (Tr. 568).

On February 27, 2003, Dr. Lemmen reiterated that Plaintiff was experiencing musculoskeletal pain. (Tr. 475). The doctor further observed that an EMG examination revealed no evidence of radiculopathy. (Tr. 475).

Treatment notes by Dr. Hatt on March 7, 2003, indicate that Plaintiff was experiencing myofascial pain. (Tr. 568).

On May 2, 2003, Plaintiff was examined by Dr. Hatt. (Tr. 564). An examination of Plaintiff's back revealed tenderness "across the entire trapezius." (Tr. 564). The doctor reiterated that Plaintiff was experiencing myofascial pain. (Tr. 564). As for Plaintiff's continued complaints

of right knee pain, Dr. Hatt referred Plaintiff to orthopaedic surgeon, Dr. Norman Boeve. (Tr. 498-99, 564).

On May 5, 2003, Plaintiff was examined by Dr. Boeve. (Tr. 498-99). An examination of Plaintiff's right knee revealed "very mild warmth," but no effusion and the ligaments were "stable." (Tr. 498). The patella was "well positioned" with "mild" crepitation, but no apprehension or subluxation. (Tr. 498). Dr. Boeve concluded that he was "not sure" of the source of Plaintiff's allegations of pain. (Tr. 499). The doctor concluded that Plaintiff needed to participate in physical therapy and begin an home exercise program. (Tr. 499).

Treatment notes dated June 2, 2003, indicate that Plaintiff was treating her pain with Tylenol and a Duragesic patch. (Tr. 562). Plaintiff reported that she was "only getting [headaches] every several months." (Tr. 562). On June 6, 2003, Plaintiff reported that her Duragesic patch was affording her "good relief" of her neck pain. (Tr. 561).

On August 15, 2003, Plaintiff reported that she has "been a lot more active." (Tr. 558). Plaintiff reported that she was walking "almost a mile" daily and doing housework. (Tr. 558). Plaintiff began participating in physical therapy later that month. (Tr. 557).

On September 12, 2003, Plaintiff was examined by Dr. Hatt. (Tr. 556). Plaintiff reported that she was experiencing knee and back pain for which she continued to take Vicodin. (Tr. 556). An examination of these areas revealed tenderness. (Tr. 556). The doctor reiterated that Plaintiff was experiencing myofascial pain. (Tr. 556). The doctor also suggested that if Plaintiff was unable to "limit her Vicodin," she should attend substance abuse counseling. (Tr. 556, 612).

On September 22, 2003, Plaintiff telephoned Dr. Hatt requesting a refill of her Vicodin prescription. (Tr. 555). The following day, Plaintiff telephoned Dr. Hatt asking why a refill of her Vicodin prescription had not been "called in." (Tr. 555).

On January 26, 2004, Plaintiff was examined by Dr. Hatt. (Tr. 602). Plaintiff reported that she was experiencing knee pain as well as pain and stiffness in her lumbar spine. (Tr. 602). An examination of Plaintiff's knee and back revealed tenderness. (Tr. 602). The doctor reported that Plaintiff was experiencing myofascial pain. (Tr. 602). Plaintiff informed the doctor that she "wants to hold off" on physical therapy. (Tr. 602).

On February 11, 2004, Plaintiff was prescribed 90 Vicodin tablets. (Tr. 601). On February 26, 2004, Plaintiff telephoned Dr. Hatt requesting additional Vicodin. (Tr. 601).

Treatment notes dated March 29, 2004, indicate that Plaintiff's right knee "got better" following a recent cortisone shot. (Tr. 600). An examination of Plaintiff's lumbar spine and SI joints revealed tenderness. (Tr. 600).

On August 17, 2004, Plaintiff reported that she was "exercising regularly, 45 minutes a day." (Tr. 595). On September 15, 2004, Dr. Hatt reiterated that Plaintiff was experiencing myofascial pain. (Tr. 593). A November 15, 2004 examination by Dr. Hatt revealed tenderness in Plaintiff's neck and shoulders. (Tr. 591). The doctor reported that Plaintiff's pain was myofascial in nature. (Tr. 591).

Treatment notes dated March 31, 2005, indicate that Plaintiff was experiencing "chronic myofascial pain" and "symptoms of narcotic withdrawal." (Tr. 585). Treatment notes dated April 12, 2005, indicate that Plaintiff was experiencing "bad withdrawals." (Tr. 584).

On May 20, 2005, Plaintiff was examined by Dr. Hatt. (Tr. 582). The doctor reported that Plaintiff "had promised not to increase her Dilaudid without asking me, but did increase it on her own." (Tr. 582). An examination of Plaintiff's lumbar spine revealed tenderness. (Tr. 582). Plaintiff was diagnosed with lumbar back pain and narcotic withdrawal. (Tr. 582).

On July 20, 2005, Plaintiff reported to the emergency room complaining that she "does not feel right." (Tr. 606-07). Plaintiff exhibited tenderness of the thoracic and trapezius muscles, but the results of an examination were otherwise unremarkable. (Tr. 606-07). Plaintiff was diagnosed with "chronic narcotic dependence and over-medication with side effect." (Tr. 607).

## ANALYSIS OF THE ALJ'S DECISION

The ALJ determined that through her date last insured, Plaintiff suffered from degenerative disc disease of the cervical spine, right knee injury, headaches, and chronic breathing difficulties, severe impairments that whether considered alone or in combination, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 663-65). The ALJ concluded that while Plaintiff was unable to perform her past relevant work, there existed a significant number of jobs which she could perform despite her limitations. (Tr. 665-68). Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[4] If the Commissioner can make a

---

[4] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

While the burden of proof shifts to the Commissioner at step five of the disability determination procedure, Plaintiff bears the burden of proof through step four, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that through the date her insured status expired, Plaintiff retained the capacity to perform light work, subject to the following limitations: (1) she can lift, carry, push, and pull 10 pounds frequently and

---

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

20 pounds occasionally; (2) she can stand/walk for 6 hours during an 8-hour workday; (3) she can sit for 6 hours during an 8-hour workday; (4) she can occasionally climb, bend, stoop, kneel, crouch, and crawl; (5) she cannot reach overhead; and (6) she must avoid even moderate exposure to respiratory irritants such as dust, odors, fumes and poor ventilation. (Tr. 665). After reviewing the relevant medical evidence, the Court concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

The ALJ determined that Plaintiff could not perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Michelle Ross.

The vocational expert testified that there existed approximately 37,900 jobs in the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 949-50). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990) (a finding that 2,500 jobs existed

which the claimant could perform constituted a significant number); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988) (the existence of 1,800 jobs which the claimant could perform satisfied the significance threshold); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006) (870 jobs in region constitutes a significant number).  The vocational expert further testified that if Plaintiff were further limited in that she could stand/walk for only two hours during an 8-hour workday, there still existed approximately 31,200 jobs that she could perform consistent with her RFC.  (Tr. 950-51).

### a. The ALJ Properly Assessed the Medical Evidence

As noted above, Plaintiff's prior action in this Court was remanded "for re-evaluation of Dr. Hatt's opinions regarding plaintiff's medication side effects and her ability to work on a consistent basis throughout an 8-hour workday." (Tr. 673).  Plaintiff asserts that on remand the ALJ failed to comply with this Court's remand order.  Plaintiff further asserts that the ALJ failed to accord sufficient weight to Dr. Hatt's opinions.  Plaintiff asserts that because Dr. Hatt was her treating physician, the ALJ was obligated to accord controlling weight to his opinions.

On September 7, 2005, Dr. Hatt was questioned by Plaintiff's counsel.  The transcript of that examination is as follows:

Q:  In the course of your practice have you treated a patient name Kim Heavener?

A:  Yes.

Q:  And how long have you been her physician?

A:  Since December 6, 2002.

17

Q:     And when Ms. Heavener first started treating with you, what were the primary complaints or problems that she saw you for?

A:     At that time she saw me for migraine headaches, myofascial pain and some depression were probably the three most...

Q:     And have you continued to treat her for those and perhaps other things over the course of the last three years?

A:     That's correct.

Q:     You mentioned myofascial pain was one of those problems that she was describing for you. How did that evidence itself in your treatment of her?

A:     She had a lot of complaints of pain, or course, and then on examination would often have tender points and very firm musculature on her visits here that would suggest that.

Q:     Were there muscle spasms you could feel?

A:     Yea, muscle spasms, yea. You could actually, the muscles feel hard like a rock.

Q:     And what types of treatment have you prescribed for Ms. Heavener for that condition?

A:     She's been through courses of physical therapy without much success. She's been on a multitude of medications. She's not responded well to anti-inflammatories and they have caused some difficulty with stomach problems. She's been on fairly significant narcotics to control pain, as well as muscle relaxants to relax her muscles. And then she's also been on medication to help her sleep because it disrupts her sleep.

Q:     You mentioned anti-inflammatories. I remember seeing some notes about elevated liver function with her. Has that been a problem in finding a helpful medication for her?

A:     She's had some minor elevation of her liver functions which have been contributing to what we call fatty liver, because she's been inactive and she's put on weight. And so we do have to be cautious because some of the medications are cleared by the liver.

Q:     Over the time that you've been treating her, I don't believe Ms. Heavener has tried working at all. Do you have an opinion about whether or not given her

condition she has the ability to maintain employment? I'm talking about an 8-hour a day, 5-day a week kind of basis.

A:      Just in talking with her and her husband, because he comes to most of her appointments, she has a difficult time with activities of daily living. Functioning in her home as far as doing cleaning, like housework, preparing meals, those types of things, her husband helps her out quite a bit with those. At times she can do those fairly successfully, but not on a consistent basis and would have a real difficult time getting through an 8-hour day.

Q:      The medications that she takes, you indicated she takes a narcotic pain medication.

A:      That's correct.

Q:      Are there common side effects from those medications that would interfere with a person's ability to work?

A:      The main one would be sedation and the sleeping pill that she takes and the muscle relaxants are both common medications that will do those and so she usually limits those to nighttime. But also the Fentanyl patch which is a narcotic that she wears continuously can cause sedation, as well as the medication that she uses called Lorazepam or Ativan, which is a Benzodiazapine.

Q:      Have you talked with her about side effects, whether or not those side effects, those common side effects are side effects for her?

A:      Yes, in fact her husband noted that. And he's noted direct correlation between the amount of medication that she's taking and the level of drowsiness that she experiences. That that's something that she does experience on a fairly regular basis, worse in the times that she's taking more medication.

Q:      In reviewing your notes, it seems like over the last, since April of 2005 to now, to September of 2005, you've tried her on a number of different medications, some because she's taking too much, I think Dilaudid particularly she was taking too much of that, more than you wanted her to take. Is that correct?

A:      That's correct. One of the things that came into play here is that for a while they had a change of insurance and it would not cover their Fentanyl patch and so we switched to another narcotic, Dilaudid, and when she was on Delaudid she took too much of that and had real problems with over-sedation

and overuse of that medication.  So we actually got her into some counseling to help her learn how to control her narcotics because she does need them. And she's done much better, of course, when she can be on the Fentanyl patch and now she's under insurance that covers those because they are very expensive and has done well with that.

Q:      So if she was taking too much medication, I take it it's not an issue that she was a drug abuser wanting to get high on these medications or somehow abusing her medications from that standpoint?

A:      Correct.  In fact, we sent her to OAR and they did an evaluation on her and they did not feel that she was a drug seeker.  But she is one of these kind of patients that given the medication and knowing that it relieves pain, she'll have the tendency to try to get rid of all of her pain and overuse her medications if she doesn't have some guidelines set for her.

Q:      Okay.  I saw a reference to OAR in the file.  What does that stand for, do you know?  Ottawa Area something?

A:      I don't recall.

Q:      Is it a substance abuse counseling service in the Ottawa County area?

A:      Yes it is.

Q:      Given your knowledge about Ms. Heavener's symptoms over the course of the years that you've been treating her, if she was to try to return to work would you expect any change in the frequency or severity of her symptoms?

A:      I think she would likely experience more muscular tension and with that, of course, more pain because she experiences that at home.  She'll feel badly about the fact that her husband is doing all this extra work and, you know, so when she has a day where she's feeling good she'll tend to dig in and do those things and she usually pays for it.

Q:      Currently, as of the last time you saw her, what medications is she taking?

A:      She's taking Ativan and that's a milligram tablet.  She takes a half of one of those four times a day and that helps to reduce anxiety, relax her muscles. It helps with restless legs.  She takes a hundred microgram Fentanyl patch and she applies that every three days which is a narcotic.  She takes, I believe she's still on 10 milligrams of Ambien at night to help her sleep.  She uses a muscle relaxant, Flexeril, 10 milligrams at night to help relax muscles and to sleep.  She also for breakthrough pain uses three or four extra-strength

Vicodin, which is another narcotic, when she has breakthrough pain from her patch. Those are the primary medications that she's on on a regular basis right now.

Q:    There are a number of different conditions that you treat her for that we haven't talked about much like GERD, migraine headaches, bronchitis, tobacco abuse. Are there other impairments or conditions that you're treating Ms. Heavener for that you think have any significant effect on her ability to work?

A:    Well, at times she has some significant asthmatic bronchitis and has had frequent treatments with antibiotics for those and during those times has had to use inhalers because of shortness of breath. She also suffers from clinical depression and is on medication for that as well. And that kind of ties in with her myofascial pain. The gastroesophageal reflux can be a problem because a lot of the medications that we use are tough on her stomach and so we have a medication to reduce the acid in her stomach often and to help with that. So those would be the main ones.

(Tr. 609-13).

First, the ALJ complied with the Court's remand order. The ALJ expressly evaluated Dr. Hatt's opinions that Plaintiff "would have a real difficult time getting through an 8-hour day" and that she experiences side effects from her medications. (Tr. 666). The ALJ expressly found that Dr. Hatt's opinions on these and other matters were not entitled to significant weight. (Tr. 666). The ALJ's conclusion in this regard is supported by substantial evidence.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, "give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Wilson*, 378 F.3d at 544. In articulating such reasons, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *See* 20 C.F.R. § 404.1527(d)(2); *see also*, *Wilson*, 378 F.3d at 544.

As the ALJ observed, Dr. Hatt's opinions are conclusory in nature and contradicted by the medical evidence of record, including Dr. Hatt's own treatment notes. As the ALJ further observed, Dr. Hatt never articulated any specific limitations imposed by Plaintiff's impairments that are inconsistent with her RFC. The medical record simply fails to support the suggestion by Dr. Hatt that Plaintiff is incapable of working. The Court further notes that Dr. Hatt's December 10, 2008 comments were made almost three years after the expiration of Plaintiff's insured status. There is

nothing in this statement to suggest that his opinions concerned Plaintiff's condition prior to the expiration of her insured status. To the contrary, the doctor's comments seem to clearly concern Plaintiff's then present condition. In sum, the medical record fails to support Dr. Hatt's conclusory opinion that Plaintiff is unable to work or is impaired to an extent beyond that recognized by the ALJ. Accordingly, the Court finds that substantial evidence supports the ALJ's decision to afford less than controlling weight to Dr. Hatt's opinions.

           b.        The ALJ Properly Assessed Plaintiff's Credibility

In assessing Plaintiff's credibility, the ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with" her residual functioning capacity. (Tr. 666). Plaintiff asserts that the ALJ failed to give proper weight to her subjective allegations.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added). As the relevant Social Security regulations make clear, however, a claimant's "statements about [her] pain or other symptoms will not alone establish that [she is] disabled." 20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)). Instead, as the Sixth Circuit has established, a claimant's assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively

established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531. This standard is often referred to as the *Duncan* standard. *See Workman v. Commissioner of Social Security*, 2004 WL 1745782 at *6 (6th Cir., July 29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Workman*, 2004 WL 1745782 at *6 (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Workman*, 2004 WL 1745782 at *6 (citing *Walters*, 127 F.3d at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony"). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations not to be fully credible, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987).

The ALJ examined the record and concluded that Plaintiff's subjective allegations of pain and limitation were inconsistent with the extensive medical record, as well as her reported activities. Moreover, as previously noted, none of Plaintiff's care providers have ever imposed on

Plaintiff specific limitations which are inconsistent with her RFC. In sum, there exists substantial evidence to support the ALJ's credibility determination.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date: July 21, 2010                      /s/ Ellen S. Carmody
                                         ELLEN S. CARMODY
                                         United States Magistrate Judge